FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2016 DEC -6 PM 1: 33

STEPHAN HARRIS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| POWDER RIVER BASIN RESOURCE COUNCIL, WESTERN ORGANIZATION OF RESOURCE COUNCILS, | ) ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) | Case No. 14-CV-97-ABJ |
| SALLY JEWELL, in her official capacity as as United States Secretary of the Interior, NED FARQUHAR, in his official capacity as Deputy Assistant Secretary for Land and Minerals Management, UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT, a Federal Agency within the United States Department of Interior, | ) ) ) ) ) ) ) ) ) ) ) | |
| Federal Respondents. | ) ) | |
| and | ) ) | |
| STATE OF WYOMING, PEABODY POWDER RIVER MINING, LLC, | ) ) ) | |
| Intervenor Respondents. | ) ) | |

## OPINION AND ORDER AFFIRMING AGENCY ACTION AND DISMISSING PETITION FOR REVIEW

Petitioners Powder River Basin Resource Council ("PRBRC") and Western

Organization of Resource Councils ("WORC") (collectively "Petitioners") challenge the

1

decision of the United States Secretary of Interior ("Secretary"), the Deputy Assistant Secretary for Lands and Minerals Management ("Deputy Secretary"), the United States Office of Surface Mining Reclamation and Enforcement ("OSMRE") (sometimes collectively "respondents" or "federal respondents") approving a mining plan modification on March 14, 2014 for Peabody Powder River Mining, LLC's ("Peabody") North Antelope Rochelle Mine ("NARM") in the Powder River Basin ("PRB") in Wyoming. The State of Wyoming and Peabody were permitted to intervene in the administrative action (collectively referred to as "intervenor-respondents"), also opposing the relief requested by Petitioners.

Petitioners seek judicial review of the decision approving a mining plan modification under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). Petitioners contend the agency's decision approving the NARM mining plan modification violates the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. §§ 1202 *et seq.* and does not satisfy the requirements for reclamation set forth in Title 30 of the Code of Federal Regulations. Petitioners contend the agency decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, in violation of the APA. The respondents and intervenor-respondents assert Petitioners' allegations are overstated and improperly apprehend both SMCRA and the Administrative Record ("AR") in this case.

Having reviewed the parties' submissions, all materials in the record, and being fully advised, the Court finds and concludes that the decision recommending approval of the mining plan modification by the Secretary is consistent with and in accordance with applicable law, is supported by substantial evidence in the administrative record, and there

2

is no clear error warranting reversal of the Secretary's decision. For the reasons stated more fully below, the Secretary's approval of the mine modification plan is affirmed and the Petition for Review will be dismissed.

## Background and Contentions

The Secretary approved a mining plan modification authorizing a coal mine expansion for Peabody's NARM, one of the largest strip mine operations in the world. The mining plan modification that was approved would expand the size of NARM to approximately 60,000 acres, with over 53,000 surface acres disturbed by mining; approximately half of the disturbed lands are federal public lands. The mining plan increases the public lands available for mining an additional 6,717 acres within NARM, for a total of nearly 30,000 acres of affected federal public land ownership. Petitioners assert that during the 30 years of operation of NARM, no lands or waters of the mine have been permanently reclaimed. None of the federal public lands impacted by NARM operations have been permanently reclaimed, which has resulted in a single use of those federal lands by Peabody.

In their petition for review, Petitioners assert that the mining plan modification was authorized "behind closed doors and without the benefit of public input and participation." They further assert that the mining plan modification fails to ensure contemporaneous and timely reclamation of federal public lands and restoration of associated waters by establishing a timetable, measured by bond release, for accomplishment of every major

reclamation step and minimizing disturbance to the hydrologic balance. The mining plan amendment exacerbates Peabody's reclamation failures by allowing Peabody to self-bond or provide a "corporate guarantee." Petitioners explain this to mean that Peabody never puts up real money intended to protect the federal resources that are damaged through operations pursuant to the mining plan modification. Thus, there is no real economic incentive for Peabody or the operator to timely or contemporaneously reclaim these public resources. Petitioners also argue that Peabody's ability to self-bond and guarantee successful reclamation is questionable. This is because Peabody has suffered significant losses over a long period of time and its credit rating was downgraded to non-investment grade or junk bond status. Petitioners assert there was a complete failure to consider Peabody's bond status and its ability to self-bond and cover its financial obligations to complete reclamation, while still allowing Peabody to cause additional disturbance of public lands within the mining plan modification.

The federal respondents have opposed Petitioners' contentions. The process for approving applications for coal leases first comes to the federal agency under the authority of the Mineral Leasing Act of 1920 ("MLA"). The first stage in that process requires the Secretary to consider various economic and environmental factors in making decisions regarding applications for federal coal leases. Frequently, this is referred to as the NEPA process. The next step in that process requires the Wyoming Department of Environmental Quality ("WDEQ"), which is the federally approved SMCRA permitting authority, 30 C.F.R. § 950.20, to consider applications for surface mining permits, provide

4

opportunities for public comment, and issue permits and approve proposed mining plans, which includes the requirement to address mining and reclamation requirements of the SMCRA program. WDEQ then forwards to OSMRE for mining plan approval. The third stage of the process requires OSMRE to conduct its own review and make recommendations to the Secretary that the proposed plans for mining federal coal be approved, disapproved, or approved with conditions. 30 U.S.C. § 207(c); 30 C.F.R. Part 746. It is the Secretary who makes the final decision on proposed mining plans.

The first and second stages require public participation; the third stage does not. Petitioner PRBRC participated in the first stage involving the decision to lease the two Wright Area coal lease tracts at issue here, the review process under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4307h. Petitioner WORC did not participate in the first stage where the decision approving leasing of federal coal lands was made. At the second stage, there were four publications in the local press in October 2013 giving notice of the mining permit approval proceedings. Notwithstanding their knowledge of agency procedures providing notice to the public and opportunities to participate and comment, neither of the petitioners in this case did so in that second stage. During the permit approval stage, detailed plans for mining operations and reclamation required by SMCRA are reviewed and assessed. Petitioners offered no comment or input when WDEQ was assessing the permit application and mining plan modification, yet they contend here that the decisions were made behind closed doors and without the opportunity for Petitioners and others to participate and offer input.

As to the third stage of the case, responding to Petitioners' claim that the OSMRE did not provide opportunities for public participation, respondents argue Petitioners have misread the pertinent regulations and applicable law. OSMRE is required to consider comments received during the NEPA and SMCRA permitting processes, but additional formal public comment is not mandated in the third stage. Consequently, the respondents urge that Petitioners do not state a cognizable claim. Respondents also assert that, even if the regulations required public participation, no prejudice was suffered by Petitioners because they were fully aware of the process and the WDEQ/OSMRE proceedings. The remaining claims lack merit because Petitioners have not identified any violation of the SMCRA performance standards.

The State of Wyoming and Peabody were permitted to intervene as respondents in this action and submitted a joint response brief in opposition to Petitioners' opening brief. Many of the issues raised in the intervenor-respondents' opposition are substantially similar to those advanced by the federal respondents. During the permit approval phase, Petitioners never objected or offered comment that WDEQ, OSMRE or the Secretary violated SMCRA by failing to ensure the mining plan modification meets performance standards for reclaiming federal lands and water resources. Because these comments and arguments were never raised during the pertinent administrative processes, the Intervenor-respondents contend they have been waived and that Petitioners cannot complain about these matters now. Even if Petitioners can raise these arguments now, the record demonstrates the arguments do not have merit. The decision documents, reviewed by

OSMRE and approved by the Secretary, approved the mining plan. The mining plan approval relied on the Environmental Impact Statement ("EIS") prepared pursuant to NEPA. The EIS was based on extensive environmental analysis, hydrologic and soil monitoring, sampling and testing pertinent to detailed operation and reclamation planning. There were meaningful opportunities for public comment and cooperating agency review and recommendations. Petitioner PRBRC actively participated in this public NEPA process. Intervenor-respondents ask that the Petition be dismissed because Petitioners have failed to identify any flaw in the state and federal analysis conducted under SMCRA.

## Decision History

### 1. Stage 1

In 2010, a Final Impact Statement for Wright Area Coal Lease Applications was prepared. This FEIS concerned approval of the issuance of two large coal leases within the PRB, which included portions of land located within the Thunder Basin National Grassland. The environmental impacts of four Lease(s) by Application (LBAs) were the focus of the EIS prepared for the Wright Area Coal Lease Applications, pursuant to NEPA. The evaluation of the environmental impacts of coal leasing first requires preparation of an Environmental Analysis (EA) or EIS evaluating site-specific and cumulative environmental and socioeconomic impacts of leasing and development of federal coal in the application areas.

An announcement of the Draft EIS for the Wright Area LBAs was published in the

Federal Register on June 26, 2009; Notice of Availability and Notice of Public Hearing for the Draft EIS was published in the Federal Register on July 8, 2009. A 60 day comment period on the Draft EIS ended August 25, 2009; public hearing was held July 29, 2009, in Gillette, Wyoming, soliciting public comment on the Draft EIS and other matters. Individuals representing organizations presented statements on the Draft EIS during the hearing; written comments were received from 15 individuals, agencies, businesses, and organizations, in addition to numerous telephone comments and emails from interested individuals and entities during the comment period. A summary of statements from the public hearing and public comments, with agency responses, is included in the Final EIS, AR 021485; Appendix I (Draft EIS Comment Letters, BLM Responses, and Hearing Summary), AR 22605-22813. After the FEIS was prepared, the Records of Decision for the Wright Area Coal Lease Applications, including the South Porcupine and North Porcupine Tracts, were issued. AR 22824 (ROD South Porcupine Coal Lease Application, August 2011); AR 22849 (ROD North Porcupine Coal Lease Application, October 2011). Both the EIS and RODs advised that before mining could commence, the operator would need a permit from WDEQ and the mining plan would have to be approved by the Assistant Secretary of Interior. AR 22834-22835.[1] The BLM authorized coal leases in the

---

[1] In 2012, the FEIS and RODs approving the four coal leases in the Powder River Basin were challenged in separate proceedings, which were consolidated for decision after the cases were filed, including 12-CV-85-ABJ, *WildEarth Guardians, Powder River Basin Resource Council, Sierra Club v. United States Forest Service et al.;* 13-CV-42-ABJ, *WildEarth Guardians and Sierra Club v. United States Bureau of Land Management;* and 13-CV-90-ABJ, *Powder River Basin Resource Council v. United States Bureau of Land*

(continued...)

North Porcupine and South Porcupine coal lease tracts in the Wright area, which would expand NARM in the PRB.

The FEIS is in the AR 21472-22813; the Record of Decision ("ROD") for the South Porcupine Tract is in the AR at 228134-228138; the ROD for the North Porcupine Tract is at AR 22839-22884.

## 2. Stage 2

Peabody acquired the coal leases in December 2011, approved in February 2012. After acquiring the coal leases, Peabody submitted its permit application package ("PAP") on April 29, 2012 to WDEQ seeking a mining permit amendment for the additional coal leases obtained on August 1, 2012 for the South Porcupine Tract and on October 1, 2012 for the North Porcupine Tract in NARM. AR 1-18104. WDEQ approved the permit amendment to include mining of additional coal leases for the South Porcupine and North Porcupine Tracts, adding 10,339.3 acres to the permit area. AR 23473; AR 23568. WDEQ's assessment process included an administrative completeness review and ultimately, a determination approving the permit to mine the additional coal leases in the

---

[1](...continued)
*Management.* In the consolidated cases the plaintiffs challenged the BLM decision to approve the coal leases, arguing that the BLM failed to comply with NEPA. The Tenth Circuit reversed and remanded with instructions to the BLM to revise its EIS and RODs, but did not vacate the leases that had been approved. *WildEarth Guardians v. United States Bureau of Land Management*, 870 F.3d 1222 (10th Cir. 2017). In the instant case, the Petitioners have not challenged the decisions approving the decision for the coal leases — instead, it focuses on matters pertaining to the approval of modifications of the NARM mining plan.

NARM, conditioned upon approval by the Secretary upon OSMRE's recommendation.

The operator, Peabody, published notice of the completed PAP application in the Gillette News Record for four consecutive weeks in October 2013, pursuant to 30 U.S.C. § 1263. Notices were also mailed to adjacent landowners, pursuant to the same statute. The notices advised of opportunities for submitting comments and objections to the permit modifications; none were received. AR 23473, 23641. The statute, 30 U.S.C. § 1263, provides:

§ 1263. Public notice and public hearings
(a) Submittal of advertisement to regulatory authority; notification of local governmental bodies
    At the time of submission of an application for a surface coal mining and reclamation permit, or revision of an existing permit, pursuant to the provisions of this chapter or an approved State program, the applicant shall submit to the regulatory authority a copy of his advertisement of the ownership, precise location, and boundaries of the land to be affected. At the time of submission such advertisement shall be placed by the applicant in a local newspaper of general circulation in the locality of the proposed surface mine at least once a week for four consecutive weeks. The regulatory authority shall notify various local governmental bodies, planning agencies, and sewage and water treatment authorities, of water companies in the locality in which the proposed surface mining will take place, notifying them of the operator's intention to surface mine a particularly described tract of land and indicating the application's permit number and where a copy of the proposed mining and reclamation plan may be inspected. These local bodies, agencies, authorities, or companies may submit written comments within a reasonable period established by the regulatory authority on the mining applications with respect to the effect of the proposed operation on the environment which are within their area of responsibility. Such comments shall immediately be transmitted to the applicant by the regulatory authority and shall be made available to the public at the same locations as are the mining applications.

(b) Objections to permit applications; informal conference; record
    Any person having an interest which is or may be adversely affected or the officer or head of any Federal, State, or local governmental agency or

authority shall have the right to file written objections to the proposed initial or revised application for a permit for surface coal mining and reclamation operation with the regulatory authority within thirty days after the last publication of the above notice. Such objections shall immediately be transmitted to the applicant by the regulatory authority and shall be made available to the public. If written objections are filed and an informal conference requested, the regulatory authority shall then hold an informal conference in the locality of the proposed mining, if requested within a reasonable time of the receipt of such objections or request. The date, time and location of such informal conference shall be advertised by the regulatory authority in a newspaper of general circulation in the locality at least two weeks prior to the scheduled conference date. The regulatory authority may arrange with the applicant upon request by any party to the administrative proceeding access to the proposed mining area for the purpose of gathering information relevant to the proceeding. An electronic or stenographic record shall be made of the conference proceeding, unless waived by all parties. Such record shall be maintained and shall be accessible to the parties until final release of the applicant's performance bond. In the event all parties requesting the informal conference stipulate agreement prior to the requested informal conference and withdraw their request, such informal conference need not be held.

(c) Prior Federal coal lease hearing as evidence

Where the lands included in an application for a permit are the subject of a Federal coal lease in connection with which hearings were held and determinations were made under section 201(a)(3)(A), (B) and (C) of this title, such hearings shall be deemed as to the matters covered to satisfy the requirements of this section and section 1264 of this title and such determinations shall be deemed to be a part of the record and conclusive for purposes of sections 1260, 1264 of this title and this section.

On December 3, 2013, WDEQ approved the permit modification application and then forwarded the decision document to OSMRE. AR 23473, 23606. The decision document (SDD) expressly stated the permit was issued on the condition that the Assistant Secretary of Interior approve the mining plan. AR 23607. The SDD indicated that the reclamation plan in the PAP could accomplish reclamation required by Wyo. Stat. § 35-11-406(n)(ii) and LQD RR, Chapter 4, Section 2. AR 23608. The SDD is in the AR at 23568-

23605.

The SDD found that Peabody had affirmatively satisfied the requirements for permit approval as required by law, including:

(1) that the application was accurate and complete, pursuant to Wyo. Stat. § 35-11-406(n)(i);

(2) that the reclamation plan can accomplish reclamation as required by the Act, Wyo. Stat. § 35-11-406(n)(ii) and LQD Coal RR, Chapter 4, Section 2;

(3) that the proposed operation was designed to prevent material damage to the hydrologic balance outside the permit area pursuant to Wyo. Stat. § 35-11-604(n)(iii);

(4) the area proposed to be mined is not included within an area designated unsuitable for surface coal mining pursuant to Wyo. Stat. § 35-11-425, within an area where mining is prohibited pursuant to Section 522(e) of P.L. 95-87, nor within an area under review for this designation in an administrative proceeding (Wyo. Stat. § 35-11-406(n)(iv));

(5) the proposed operation contains alluvial valley floors within or adjacent to the permit area, but will not interrupt, discontinue, or preclude farming on alluvial valley floor(s) that are irrigated or naturally subirrigated, except those undeveloped range lands within the alluvial valley floors which are not significant to farming, or where the farming that might be precluded

is of such a small acreage that its loss will have a negligible impact on the farm's agricultural production, and the proposed operation will not materially damage the quantity or quality of water in surface or underground water systems that supply these alluvial valley floors (Wyo. Stat. § 35-11-406(n)(v));

(6) the area to be surface mined does not contain prime farmland (Wyo. Stat. § 35-11-406(n)(vi));

(7) the schedule required by Wyo. Stat. § 35-11-406(a)(xiv) and the compliance review conducted by WDEQ/LQD suggests that all surface coal mining operations owned or controlled by the applicant are currently in compliance with the act and all applicable State and Federal laws, or that any violation has been or is in the process of being corrected to the satisfaction of the authority, department or agency that has jurisdiction over the violation (Wyo. Stat. § 35-11-406(n)(vii));

(8) neither the applicant nor operator controls or has controlled mining operations with a demonstrated pattern of willful violations of such nature and duration with such resulting irreparable harm to the environment as to indicate reckless, knowing or intentional conduct (Wyo. Stat. § 35-11-406(o));

(9) the applicant does not qualify for an experimental practice variance (LQD Coal RR Chapter 9);

(10) all appropriate Federal, State, and Local government agencies

with an interest in historic preservation have approved the proposed operation, even though it may adversely affect any site(s) included in, or eligible for inclusion in, the National Register of Historic Places. A plan to mitigate adverse effects has been approved by the State Historic Preservation Office, and other appropriate agencies, and has been incorporated in the applicant's mining plan/or has been attached to the permit by condition (LQD Coal RR Chapter 12, Section 1(a(v)(C));

(11) although the proposed operation is within one hundred feet of the outside right-of-way line of a public road, the road may be relocated or the area affected because the applicant has obtained the necessary approvals of the authority with jurisdiction over the public road. Public notice and an opportunity for public hearings for this purpose have been provided and the required written finding has been made determining that the interests of the public and the affected landowners will be protected from the proposed operation (LQD Coal RR Chapter 12, Section 1(a)(v)(D));

(12) for the term covered by the permit, the proposed operation will be consistent with other surface coal mining and reclamation operations proposed or contemplated in pending or approved mining permits (LQD Coal RR Chapter 12, Section 1 (a)(iv)(A));

(13) the mining and reclamation activities proposed will not affect the continued existence of endangered or threatened species or result in the

destruction or adverse modification of their critical habitats (LQD Coal RR Chapter 4, Section 2(r)(iii);

(14) no mining or reclamation activities will take place within the boundaries of the National Park System, the National Wildlife Refuge System, the National System of Trails, the National Wilderness Preservation System, the Wild and Scenic Rivers System, or any National Forest (LQD Coal RR Chapter 12 Section 1(a)(v)(A) and (B));

(15) no mining or reclamation activities will be conducted within three hundred feet of any occupied dwelling, public building, school, church, community, institutional building, or public park, nor within one hundred feet of a cemetery (LQD Coal RR Chapter 12, Section 1(a)(v)(E), (F), and (G)); and

(16) public notice was given in the Gillette News Record from October 4 to October 21, 2013, with no objections to the permit received, Wyo. Stat. § 35-11-406(j) and (k)).

Peabody was advised by letter dated December 2, 2013 of approval of the permit amendment for NARM. AR 23561-23567. The SDD was provided to the BLM Field Office in Casper, Wyoming; OSMRE in Denver, Colorado was provided a copy of the SDD and application for its own independent review. AR 23473.

### 3. Stage 3

The next step taken with respect to the mining plan modification process is reflected in the AR at 23464-23470, the Memorandum to the Director of the OSMRE from the OSMRE Regional Director in Denver, Colorado, date-stamped February 27, 2014, recommending that the Secretary approve the mining permit modification. The recommendation for approval of the mining plan permit modification was based on the PAP including the Resource Recovery and Protection Plan ("R2P2") submitted by Peabody; compliance with NEPA; documentation assuring compliance with the requirements of other federal laws, regulations and executive orders; comments and recommendations or concurrence of other federal agencies, and the public; findings and recommendations of the BLM regarding the R2P2, federal lease requirements, and the MLA; and, findings and recommendations of the WDEQ regarding the permit application and the Wyoming state program. AR 23464-23465.

This recommendation memorandum includes discussion of the relevant background concerning NARM, outlines the proposed actions and identifies federal coal lands that would be affected by the proposal, and discusses the scope and impact of the project and the review process leading up to the recommendation for approval of the proposed mining plan modification. The review process is addressed in the recommendation memorandum at AR 23468-23469. It notes WDEQ reviewed the permit application under the approved Wyoming State program, the Federal lands program, and the Wyoming cooperative agreement. WDEQ approved the permit application on December 3, 2013. OSMRE consulted with other federal agencies, and adopted the EIS including the biological

assessment, surveys for cultural resources and inventory reports regarding same provided to State Historical Preservation Office ("SHPO") for review, among other things. Additionally, the OSMRE recommendation memorandum to the Director stated:

> OSMRE has determined that the impacts on the quality of the human environment associated with approval of this mining plan modification have been adequately disclosed in previous NEPA analyses. The environmental analysis prepared by BLM with OSMRE as a cooperating agency, the EIS and other environmental documents noted in the Statement of NEPA Adoption and Compliance, describe the impacts that may result from approval of this mining plan modification and its alternatives. The adequacy of the EIS is currently the subject of a judicial challenge, *WildEarth Guardians v. U.S. Forest Service,* 12-CV-00085-ABJ (D. Wyo.). The Statement of NEPA Adoption and Compliance and supporting environmental analysis are included in the attached decision document.
>
> OSMRE did not identify any issues during its review that required resolution by the addition of special conditions to the mining plan modification approval.
>
> Publication of four consecutive weekly notices in the Gillette News Record newspaper notified the public of the availability of the administratively complete PAP for review. The last publication date was October 21, 2013. No public comments on the PAP were received after the public notice was published.
>
> WDEQ determined that a bond for $332,669,500 is adequate for NARM Permit No. 569 associated with this mining plan modification. The bond is payable to both the State of Wyoming and the United States.

AR 23469-23470.

The Statement of NEPA Adoption and Compliance for the NARM mining plan modification is at AR 23474-23475. The OSMRE prepared a Statement of National Environmental Policy Act (NEPA) Adoption and Compliance for Peabody Powder River Mining, LLC North Antelope Rochelle Mine Federal Coal Leases WYW173408 and WYW176095 Mining Plan Decision Document. The introduction to this document notes

that the PAP for a permit revision for NARM was submitted to WDEQ. WDEQ approved

the permit revision December 3, 2013. The PAP proposed extending surface mine mining

operations into 9,607 acres of Federal Leases WYW173408 and WYW176095. "In

accordance with the Mineral Leasing Act of 1920, under delegation of authority, the

Assistant Secretary, Land and Minerals Management, must approve, approve with

conditions, or disapprove the proposed mining plan modification for Federal Leases

WYW173408 and WYW176095. Pursuant to 30 CFR Part 746, the Office of Surface

Mining Reclamation and Enforcement (OSMRE) is recommending approval of the mining

plan action without special conditions." AR 23474. The recommendation includes a

statement of environmental significance of the proposed action, and includes a

determination that the *Final Environmental Impact Statement for the Wright Area Coal

Lease Applications, July 2010* (EIS) adequately described the potential direct, indirect, and

cumulative impacts that may result from approval of this mining plan modification and its

alternatives. *Id.* It continues:

> This Statement of NEPA Adoption and Compliance is based on the above
> EIS in which OSMRE, as a cooperating agency, participated in its
> development. In accordance with 40 CFR 1506.3(a) and (c), OSMRE has
> independently reviewed the EIS and finds that OSMRE's comments and
> suggestions have been satisfied, the EIS meets Council on Environmental
> Quality (CEQ) standards, and complies with 43 CFR Subpart E and other
> program requirements. The adequacy of the EIS is currently the subject of
> a judicial challenge, *WildEarth Guardians v. U.S. Forest Service*, 12-cv-
> 00085-ABJ (D. Wyo.). In addition, BLM's review and approval of the
> Resource Recovery and Protection Plan, the PAP, and WDEQ's written
> findings for the PAP have been independently reviewed by OSMRE. These
> documents reviewed in conjunction with the attached EIS adequately and
> accurately access the environmental impacts of the proposed mining plan
> action. The opportunity for public input was provided during and with

18

completion of the EIS, with submission of the PAP, and during issuance of the state mining permit.

* * * *

The undersigned has determined that OSMRE's public involvement requirements for an EIS have been met. The EIS was subject to public review and comment prior to publication of the final EIS. Comments on the EIS were reviewed and analyzed by the BLM and the EIS was revised as appropriate. Comments outside the scope of the EIS were addressed in the BLM Record of Decision. No comments on the PAP were received after the date of last publication. In addition, the referenced EIS and this Statement of NEPA Adoption and Compliance will be made publicly available on the OSMRE Western Region's website.

After an independent review of the *Final Environmental Impact Statement for the Wright Area Coal Lease Applications, July 2010*, I have determined that it adequately addresses the impacts of the proposed mining plan modification, and hereby adopt the entire EIS.

This Statement of NEPA Compliance is dated February 26, 2014 and was signed by the Field Operations Branch Manager of the U.S. Department of the Interior, Office of Surface Mining Reclamation and Enforcement. AR 23474-23475.

Following the recommendation for approval from OSMRE, the Secretary of Interior issued its mining plan modification approval document on March 14, 2014, signed by the Principal Deputy Assistant Secretary, Lands and Minerals Management.   AR 23644.

The various Mining Plan Decision documents are in the AR at 23460-23648.  PAP documents are in the AR at 1-18104.

## Statutory and Regulatory Framework

A number of federal statutory provisions pertain to coal leasing decisions. The Mineral Leasing Act (MLA), 30 U.S.C. §§ 181-287 authorizes the Secretary to lease federal

coal deposits. The Secretary shall, on request of a qualified applicant or on his or her own initiative, "Offer [coal] lands for leasing," and "award leases thereon by competitive bidding." 30 U.S.C. § 201(a)(1). The MLA requires approval of a mining plan by the Secretary before surface disturbing activity occurs. 30 U.S.C. § 307(C).

OSMRE recommends mining plan approval; mining plans must meet the requirements of 30 C.F.R. § 746.13. The plans must be based upon, at a minimum:

(a) The permit application package, including the resource recovery and protection plan;

(b) Information prepared in compliance with the National Environmental Policy Act of 1969, 42 U.S.C. 4321, et seq.;

(c) Documentation assuring compliance with the applicable requirements of other Federal laws, regulations and executive orders other than the Act;

(d) Comments and recommendations or concurrence of other Federal agencies, as applicable, and the public;

(e) The findings and recommendations of the Bureau of Land Management with respect to the resource recovery and protection plan and other requirements of the lease and the Mineral Leasing Act;

(f) The findings and recommendations of the regulatory authority with respect to the permit application and the State program; and

(g) The findings and recommendations of OSM with respect to the additional requirements of this subchapter.

Petitioners argue that subsection (d) of this regulation requires a formal public comment period at the mining plan amendment approval stage, However, this is not correct.

The Surface Mining Control and Reclamation Act, SMCRA, 30 U.S.C. §§ 1201-

1328, is also pertinent to consideration of the issues in this case. It has been described by the United States Supreme Court as a "comprehensive statute designed to 'establish a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations.' § 102(a), 30 U.S.C. § 1202(a) (1976 ed., Supp. III)." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 268–69, 101 S. Ct. 2352, 2356 (1981).

The Tenth Circuit has addressed SMCRA. For instance, in *Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1231–32 (10th Cir. 2013), the Tenth Circuit stated:

> SMCRA provides for "a program of cooperative federalism that allows the States, within limits established by federal minimum standards, to enact and administer their own regulatory programs, structured to meet their own particular needs." *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981). Under SMRCA, states may submit proposed regulatory programs to the Secretary of the Interior for approval. § 1253(a). Once a state has obtained approval of its program, it is said to have achieved "primacy." State laws and regulations implementing SMCRA "become operative for the regulation of surface coal mining, and the State officials administer the program." *Bragg v. W. Va. Coal Ass'n*, 248 F.3d 275, 288 (4th Cir. 2001). States have "exclusive jurisdiction over the regulation of surface coal mining and reclamation operations" within their borders, § 1253(a), subject to three statutory exceptions, see § 1271(a)-(c).

SMCRA is a program of cooperative federalism, which allows states to administer their own regulatory programs, consistent with established minimum federal standards, subject to oversight by the Department of Interior. See *Hodel*, 452 U.S. at 289. States may assume primary jurisdiction over the regulation of surface coal mining and reclamation operations upon approval by the Secretary of a state's program proposal. 30 U.S.C. §

1253. Upon approval of a state's proposed program, state law will govern regulation of surface coal mining and reclamation operations in that state, but it is subject to oversight by the Secretary, as the Secretary has an obligation to evaluate the administration of approved state programs, inspect and monitor the operations of state programs. 30 U.S.C. §§ 1267, 1271. The State of Wyoming, through the Department of Environmental Quality, Land Quality Division and the Secretary of the Department of the Interior, through the OSMRE, have entered into a cooperative agreement regarding a program for the conduct of surface mining operations within the State of Wyoming. 30 C.F.R. § 950.20. Once the state assumes primary jurisdiction over surface mining activities, OSMRE is authorized to oversee state program implementation, including inspection and enforcement activities. 30 U.S.C. § 1271.

**Wyoming's Regulatory Program**

OSMRE has delegated most regulatory and enforcement responsibilities over coal surface mining activities in Wyoming to the WDEQ, pursuant to that state and federal cooperative agreement. A state mining permit from WDEQ is required to conduct surface coal mining and reclamation operations. 30 U.S.C. § 1253. WDEQ considers applications for surface mining permits, receives public comment, issues permits and proposed mining plans under a regulatory program approved by OSMRE. 30 C.F.R. §§ 950.10, 950.15. During this process, WDEQ is required to ensure that surface coal mining operations meet performance standards set forth in SMCRA. Title 30, United States Code, § 1265 provides

in part:

§ 1265. Environmental protection performance standards

(a) Permit requirement

Any permit issued under any approved State or Federal program pursuant to this chapter to conduct surface coal mining operations shall require that such surface coal mining operations will meet all applicable performance standards of this chapter, and such other requirements as the regulatory authority shall promulgate.

(b) General standards

General performance standards shall be applicable to all surface coal mining and reclamation operations and shall require the operation as a minimum to—

(1) conduct surface coal mining operations so as to maximize the utilization and conservation of the solid fuel resource being recovered so that reaffecting the land in the future through surface coal mining can be minimized;

(2) restore the land affected to a condition capable of supporting the uses which it was capable of supporting prior to any mining, or higher or better uses of which there is reasonable likelihood, so long as such use or uses do not present any actual or probable hazard to public health or safety or pose any actual or probable threat of water diminution or pollution, and the permit applicants' declared proposed land use following reclamation is not deemed to be impractical or unreasonable, inconsistent with applicable land use policies and plans, involves unreasonable delay in implementation, or is violative of Federal, State, or local law;

* * * *

(10) minimize the disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation by--
(A) avoiding acid or other toxic mine drainage by such measures as, but not limited to--

23

(I) preventing or removing water from contact with toxic producing deposits;

(ii) treating drainage to reduce toxic content which adversely affects downstream water upon being released to water courses;

(iii) casing, sealing, or otherwise managing boreholes, shafts, and wells and keep3 acid or other toxic drainage from entering ground and surface waters;

(B) (I) conducting surface coal mining operations so as to prevent, to the extent possible using the best technology currently available, additional contributions of suspended solids to streamflow, or runoff outside the permit area, but in no event shall contributions be in excess of requirements set by applicable State or Federal law;

(ii) constructing any siltation structures pursuant to subparagraph (B)(I) of this subsection prior to commencement of surface coal mining operations, such structures to be certified by a qualified registered engineer or a qualified registered professional land surveyor in any State which authorizes land surveyors to prepare and certify such maps or plans to be constructed as designed and as approved in the reclamation plan;

(C) cleaning out and removing temporary or large settling ponds or other siltation structures from drainways after disturbed areas are revegetated and stabilized; and depositing the silt and debris at a site and in a manner

24

approved by the regulatory authority;

(D) restoring recharge capacity of the mined area to approximate premining conditions;

(E) avoiding channel deepening or enlargement in operations requiring the discharge of water from mines;

(F) preserving throughout the mining and reclamation process the essential hydrologic functions of alluvial valley floors in the arid and semiarid areas of the country; and

(G) such other actions as the regulatory authority may prescribe;

\* \* \* \*

(16) insure that all reclamation efforts proceed in an environmentally sound manner and as contemporaneously as practicable with the surface coal mining operations: Provided, however, That where the applicant proposes to combine surface mining operations with underground mining operations to assure maximum practical recovery of the mineral resources, the regulatory authority may grant a variance for specific areas within the reclamation plan from the requirement that reclamation efforts proceed as contemporaneously as practicable to permit underground mining operations prior to reclamation:

(A) if the regulatory authority finds in writing that:

(I) the applicant has presented, as part of the permit application, specific, feasible plans for the proposed underground mining operations;

(ii) the proposed underground mining operations are necessary or desirable to assure maximum practical recovery of the mineral resource and will avoid multiple disturbance of the surface;

(iii) the applicant has satisfactorily demonstrated that the plan for the underground mining operations conforms to requirements for underground mining in the jurisdiction and that permits

necessary for the underground mining operations have been issued by the appropriate authority;

(iv) the areas proposed for the variance have been shown by the applicant to be necessary for the implementing of the proposed underground mining operations;

(v) no substantial adverse environmental damage, either on-site or off-site, will result from the delay in completion of reclamation as required by this chapter;

(vi) provisions for the off-site storage of spoil will comply with paragraph (22);

(B) if the Secretary has promulgated specific regulations to govern the granting of such variances in accordance with the provisions of this subsection and section 1251 of this title, and has imposed such additional requirements as he deems necessary;

(C) if variances granted under the provisions of this subsection are to be reviewed by the regulatory authority not more than three years from the date of issuance of the permit; and

(D) if liability under the bond filed by the applicant with the regulatory authority pursuant to section 1259(b) of this title shall be for the duration of the underground mining operations and until the requirements of this subsection and section 1269 of this title have been fully complied with.[note omitted]

*Id.* (notes omitted). The statute provides additional detailed provisions applicable to all surface coal mining and reclamation and additional minimum requirements that are not set out here in entirety.

Under this program of cooperative federalism, WDEQ considers whether the applicant has demonstrated that reclamation as required by federal statute, 30 U.S.C. § 1260(b)(2), and by the Wyoming program can be accomplished under the reclamation plan included in the PAP. The SDD, in the AR beginning at 23606, determined that the operator had made the showing required to satisfy the reclamation requirements set forth in the scheme for evaluating and assessing mining permit applications. The next step is to submit the permitted mining plan to OSMRE review; in turn, OSMRE makes its recommendation to the Secretary whether to approve, not approve, or conditionally approve the mining plan. 30 C.F.R. § 746.13. The Secretary then makes the final decision based upon the recommendation whether to approve, not approve, or conditionally approve the mining plan.

## Standard of Review

In *Audubon Society of Greater Denver v. United States Army Corp of Engineers*, 2018 WL 5782609 (Nov. 5, 2018), the standard of review under the APA is set out:

> Under the APA, we will not set aside the [agency's] decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002).

The scope of review under the APA is "narrow[,] and [the] court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm*

*Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Court's role is to ensure the agency's decision is based on relevant factors and is not a "clear error of judgment." *Id.*

Review is confined to the administrative record in existence at the time of the decision made by the agency. Petitioners filed a Notice of Supplemental Authority contending that OSMRE and the Secretary failed to evaluate whether Peabody's self-bond for reclamation of federal public lands impacted by surface coal mining at NARM was sufficient to cover the operator's responsibilities for reclamation under SMCRA. In their Notice of Supplemental Authority, Petitioners point to the Chapter 11 bankruptcy filed by Peabody long after the decision approving the mining plan modification was made. The Court will not consider this "supplemental authority" in reviewing this APA matter.

The United States District Court in *Colorado Environmental Coalition v. Office of Legacy Management,* Unreported Decision, Text at 2017 WL 897838, *1 (D. Colo. 2017), addresses efforts to add supplemental authority that will expand the administrative record. That court offers a concise and helpful discussion of the applicable law:

> A proper administrative record must contain "all documents and materials directly or indirectly considered by the agency." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). The Court presumes that the agency properly designated its record absent clear evidence to the contrary. *Id.* at 740. The plaintiff bears the burden to rebut that presumption. *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1275 (D. Colo. 2010) ("CNE").
>
> A plaintiff may move to "complete" the record, or to "supplement" it, or both. "Completing the record" means adding materials the agency considered but failed to include in the record. *Id.* at 1274 n.7. "Supplementing the record" means adding materials the agency did not consider, but should nonetheless be included in the record to permit a proper evaluation of the agency's decision. *Id.*

In seeking to complete the record, a plaintiff must establish "(1) when the documents were presented to the agency; (2) to whom; (3) and under what context." *Id.* at 1275. Having established these elements, the plaintiff must finally establish that the documents were indeed considered directly or indirectly by the relevant agency decision-makers. *Id.*

The standard for supplementing the record is less straightforward. In theory, supplementation should be "extremely limited" because "[a]ggressive use of extra-record materials... would run directly counter" to the notion that "the agency's action must be reviewed on the basis articulated by the agency and on the evidence and proceedings before the agency at the time it acted." *Am. Min. Cong. v. Thomas*, 772 F.2d 617, 626 (10th Cir. 1985). In the last few decades, however, the Tenth Circuit has endorsed various justifications for supplementing the record, including the following:

- "the agency action is not adequately explained and cannot be reviewed properly without considering the cited materials";
- "the record is deficient because the agency ignored relevant factors it should have considered in making its decision";
- "the case is so complex and the record so unclear that the reviewing court needs more evidence to enable it to understand the issues"; and
- "evidence coming into existence after the agency acted demonstrates the actions were right or wrong."

*Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1028 n.1 (10th Cir. 2001).

In this case, the Court discerns no permissible reason that would justify allowing the additional extra-record facts to the administrative record. Petitioners here are not asking to offer additional authority that might shed light on the pertinent legal landscape or provide additional guidance in considering the issues raised in the petition for review. The decision by the agency was made in March 2013. Chapter 11 bankruptcy petitions were filed by Peabody Energy Corporation and certain direct and indirect subsidiaries on April 13, 2016 in the United States Bankruptcy Court for the Eastern District of Missouri. There were 154

separate entities seeking Chapter 11 relief, all bankruptcy proceedings that were jointly administered. (Doc. 59.) Any decisions or agreements arising out of those bankruptcy proceedings related to coal mining in the PRB, including bonding requirements for proper reclamation, if there are any, did not even exist and were unavailable when the agency decision was made in 2013 approving the mining plan modification for NARM. Anything derived from this massive bankruptcy undertaking would require conjecture and speculation, at best, in aiding the review the propriety of the Secretary's approval of the mining plan in this case.

The agency action has been explained and will be reviewed only upon consideration of the existing administrative record. Nothing suggests that governing principles and factors necessary to the agency decision were disregarded when the mining plan was approved. The extra-record evidence offered to supplement the record will not be considered in this APA review proceeding. Allowing the introduction of evidence that could not have been and never was before the agency will not permitted. As such, the Petitioners' "Notice of Supplemental Authority" (Doc. 73) will not be considered and will be struck.

## Discussion and Analysis

### 1. Was there a legal violation of public participation requirements in making the decision to approve the NARM mining plan modification?

As to this first generally defined issue, the Court finds that the Petitioners' public

participation arguments are unavailing. The phasing of the various processes concerning coal leasing and permits to mine upon approval of detailed mining plans provides multiple and various opportunities for public participation. In the first stage, the BLM EIS proceedings conducted pursuant to NEPA considered whether the Wright Area Porcupine Tracts should be leased for coal mining. During this EIS / NEPA process, Petitioner PRBRC did participate in the notice and comment stage. WORC did not participate although the opportunity to do so was clearly available. During the EIS process, opportunities to address and comment on the lease applications were provided to the public. By way of example, notice of a public meeting to be held in Casper, Wyoming in January 2007 was given; notice was given in July 2007 of the agency's intention to prepare an EIS. The RODs recite public involvement opportunities to comment and participate with regard to the Porcupine coal lease applications and the NEPA review process concerning the Wright Area Coal Lease Application EIS. For instance:

## PUBLIC INVOLVEMENT

BLM received the Porcupine coal lease application on September 29, 2006. BLM announced the receipt of the LBA and published a Notice of Public Meeting in the Federal Register on December 12, 2006. At the public meeting held in Casper, Wyoming on January 18, 2007, the Powder River Regional Coal Team (PRRCT) reviewed the Porcupine coal lease application and BTU presented information about their existing mine and the pending lease application. The PRRCT recommended that BLM process the application. On March 14, 2007, BLM notified the Governor of Wyoming that BTU had made application for the North and South Porcupine Federal coal lands.

BLM published a Notice of Intent to Prepare an EIS and Notice of Public Meeting in the Federal Register on July 3, 2007, in the Gillette News-Record on July 6, 2007, and in the Douglas Budget on July 11, 2007. Scoping

notices were also mailed to Federal, state, and local government agencies, conservation groups, commodity groups, and individuals who could be impacted by this LBA. BLM and the applicant jointly developed the distribution list. On July 24, 2007, a public scoping meeting was held in Gillette, Wyoming. The scoping period extended from July 3 through September 3, 2007, during which time BLM received nine comment letters.

A notice announcing the availability of the *Wright Area Coal Lease Applications Draft EIS* was published in the Federal Register by the EPA on June 26, 2009. Parties on the distribution list were sent copies of the Draft EIS at that time. A 60-day comment period on the Draft EIS commenced with publication of the EPA's Notice of Availability and ended on August 25, 2009. The BLM published a Notice of Availability/Notice of Public Hearing for the Draft EIS in the Federal Register on July 8, 2009. The BLM's Federal Register notice announced the date and time of the formal public hearing, which was held on July 29, 2009, in Gillette, Wyoming. The purpose of the public hearing was to solicit public comment on the Draft EIS, fair market value, maximum economic recovery, and the proposed competitive sale of Federal coal from the Wright Area LBAs. BLM also published a Notice of Public Hearing in both the Douglas Budget and Gillette News-Record newspapers on July 8, 2009. Two individuals presented statements on the Draft EIS during the hearing. BLM received written comments from 17 individuals, agencies, businesses, and organizations as well as over 500 comment e-mails from other interested parties. Comments that BLM received on the Draft EIS and how BLM considered these comments during the preparation of the Final EIS were included in Appendix I of the Final EIS. Written comments and the transcript of the formal public hearing are also available for review at the BLM Wyoming High Plains District Office in Casper.

A notice announcing the availability of the *Wright Area Coal Lease Applications Final EIS* was published in the Federal Register by the EPA on July 30, 2010. Parties on the distribution list were sent copies of the Final EIS at that time. The comment period for the Final EIS ended on August 30, 2010. As explained on the first page of the Final EIS, the public review period was open for 30 days after EPA's Notice of Availability published in the Federal Register.

BLM received written comments on the Final EIS from Michael J. Strawn, Powder River Basin Resource Council/Sierra Club/Center for Biological Diversity, Leslie Glustrom, WildEarth Guardians/Sierra Club/Defenders of Wildlife, Dorsey & Whitney LLP/Ark Land Company, and the Campbell County Board of Commissioners. BLM has reviewed, evaluated, and considered these comments. The comment letters and BLM's responses are available at http://www.blm.gov/wy/st/en/info/NEPA/HighPlains/Wright-Coal.html. All comments that were received in a timely manner were considered in the

preparation of this Record of Decision (ROD).

ROD, EIS for the South Porcupine Coal lease application, AR 22827-22828; ROD, EIS for the North Porcupine coal lease application (the same). AR 22852-22853. See also FEIS, Wright Area Coal Lease Applications, AR 22192-22193. The distribution list for the FEIS is also in the AR 22199-22204 (Table 5-3); FEIS, Appendix I, Draft EIS Comment Letters, BLM Responses, and Hearing Summary, AR 22605-22813.

Of note here, PRBRC commented during the EIS process. Written comments from PRBRC concerning the Draft EIS are in the AR at 22606-22616. Among other things, PRBRC urged that the new tracts of coal could not be leased without first ensuring compliance with SMCRA's contemporaneous reclamation mandates for existing tracts, recognizing that OSMRE and WDEQ are the agencies charged with SMCRA compliance. AR 22612-22613. PRBRC's representative also spoke at the July 29, 2009 public hearing held in Gillette, Wyoming on the Wright Area Coal Lease Application Draft EIS. AR 22813.

After the FEIS was completed, the RODs for the Porcupine Tracts were issued and further advised that before mining could occur, a SMCRA mining permit from WDEQ and approval of any mining plan permit modification by the Department of Interior were required, pursuant to the cooperative agreement.

> OSM is a cooperating agency on this EIS. After a federal coal lease is issued, the Surface Mining Control and Reclamation Act of 1977 (SMCRA) gives OSM primary responsibility to administer programs that regulate surface coal mining operations and the surface effects of underground coal mining operations. USFS is also a cooperating agency on this EIS. If any USFS-administered lands are included in a tract that is proposed for leasing, USFS must consent to leasing the federal coal before BLM can make a decision to hold a federal coal lease sale.

WDEQ is also a cooperating agency on this EIS. Pursuant to Section 503 of SMCRA, WDEQ developed, and in November 1980 the Secretary of the Interior approved, a permanent program authorizing WDEQ to regulate surface coal mining operations and surface effects of underground mining on nonfederal lands within the state of Wyoming. In January 1987, pursuant to Section 523(c) of SMCRA, WDEQ entered into a cooperative agreement with the Secretary of the Interior authorizing WDEQ to regulate surface coal mining operations and surface effects of underground mining on federal lands within the state.

Pursuant to the cooperative agreement, a federal coal lease holder in Wyoming must submit a permit application package to OSM and WDEQ/LQD for any proposed coal mining and reclamation operations on federal lands in the state. WDEQ/LQD reviews the permit application package to insure the permit application complies with the permitting requirements and the coal mining operation will meet the performance standards of the approved Wyoming program. OSM, BLM, USFS and other federal agencies review the permit application package to insure it complies with the terms of the coal lease, the MLA, NEPA, and other federal laws and their attendant regulations. If the permit application package complies, WDEQ issues the applicant a permit to conduct coal mining operations. OSM recommends approval, approval with conditions, or disapproval of the MLA plan to the Assistant Secretary of the Interior, Land and Minerals Management. Before the MLA mining plan can be approved, the BLM must concur with this recommendation.

If a proposed LBA tract is leased to an existing mine, the lessee is required to revise its coal mining permit prior to mining the coal, following the processes outlined above. As a part of that process, a detailed new plan would be developed showing how the newly-leased lands would be mined and reclaimed. The area of mining disturbance would be larger than the newly-leased area to allow for activities such as overstripping, matching reclaimed topography to undisturbed topography, constructing flood control and sediment control facilities, and related activities. Specific impacts that would occur during the mining and reclamation of the LBA tract would be addressed in the mining and reclamation plan, and specific mitigation measures for anticipated impacts would be described in detail at that time.

WDEQ enforces the performance standards and permit requirements for reclamation during a mine's operation and has primary authority in environmental emergencies. OSM retains oversight responsibility for this enforcement. Where federal surface or coal resources are involved, BLM,

and USFS for USFS-administered lands, have authority in emergency situations if WDEQ or OSM cannot act before environmental harm and damage occurs.

Appendix A presents other federal and state permitting requirements that must be satisfied to mine these LBA tracts.

FEIS, AR 21594-21596. The RODs included similar explanations that prior to mining the operator would need a permit from WDEQ and approval of a mining plan by Interior. AR 22834; 22859-22860.

After the leases were acquired, the operator applied to WDEQ for amendment of the mining permit, submitted on April 19, 2012. AR 23473; AR 23568 (Chronology). Thus, the second phase, the mining permit approval process, was commenced. WDEQ determined the PAP was administratively complete for public review and comment and OSMRE received the PAP on November 5, 2012. *Id.* Notice of the permit application and companion review process was given in the Gillette News Record from October 4 to October 21, 2013, identifying the plans for mining and the reclamation plan offered in accordance with the SMCRA requirements; notices were also mailed to adjacent landowners. Published notices described the location of proposed activities, advised of the availability of the administrative complete PAP for public review and noted opportunity for public participation and for requesting an informal conference. No objections to the permit modification application were received. AR 234641.

Neither PRBRC nor WORC participated in this process, providing no input, comment or any other objection regarding this proposed mining permit modification. They submitted no objection to the permit application, although they could have done so

pursuant to 30 U.S.C. § 1263.  This section provides:

(a) Submittal of advertisement to regulatory authority; notification of local governmental bodies

At the time of submission of an application for a surface coal mining and reclamation permit, or revision of an existing permit, pursuant to the provisions of this chapter or an approved State program, the applicant shall submit to the regulatory authority a copy of his advertisement of the ownership, precise location, and boundaries of the land to be affected. At the time of submission such advertisement shall be placed by the applicant in a local newspaper of general circulation in the locality of the proposed surface mine at least once a week for four consecutive weeks. The regulatory authority shall notify various local governmental bodies, planning agencies, and sewage and water treatment authorities, of [note omitted] water companies in the locality in which the proposed surface mining will take place, notifying them of the operator's intention to surface mine a particularly described tract of land and indicating the application's permit number and where a copy of the proposed mining and reclamation plan may be inspected. These local bodies, agencies, authorities, or companies may submit written comments within a reasonable period established by the regulatory authority on the mining applications with respect to the effect of the proposed operation on the environment which are within their area of responsibility. Such comments shall immediately be transmitted to the applicant by the regulatory authority and shall be made available to the public at the same locations as are the mining applications.

(b) Objections to permit applications; informal conference; record

Any person having an interest which is or may be adversely affected or the officer or head of any Federal, State, or local governmental agency or authority shall have the right to file written objections to the proposed initial or revised application for a permit for surface coal mining and reclamation operation with the regulatory authority within thirty days after the last publication of the above notice. Such objections shall immediately be transmitted to the applicant by the regulatory authority and shall be made available to the public. If written objections are filed and an informal conference requested, the regulatory authority shall then hold an informal conference in the locality of the proposed mining, if requested within a reasonable time of the receipt of such objections or request. The date, time and location of such informal conference shall be advertised by the regulatory authority in a newspaper of general circulation in the locality at least two weeks prior to the scheduled conference date. The regulatory authority may arrange with the applicant upon request by any party to the

administrative proceeding access to the proposed mining area for the purpose of gathering information relevant to the proceeding. An electronic or stenographic record shall be made of the conference proceeding, unless waived by all parties. Such record shall be maintained and shall be accessible to the parties until final release of the applicant's performance bond. In the event all parties requesting the informal conference stipulate agreement prior to the requested informal conference and withdraw their request, such informal conference need not be held.

(c) Prior Federal coal lease hearing as evidence
Where the lands included in an application for a permit are the subject of a Federal coal lease in connection with which hearings were held and determinations were made under section 201(a)(3)(A), (B) and (C) of this title, such hearings shall be deemed as to the matters covered to satisfy the requirements of this section and section 1264 of this title and such determinations shall be deemed to be a part of the record and conclusive for purposes of sections 1260, 1264 of this title and this section.

The permit amendment was approved, adding an additional 10,339.3 acres to the permit area; the approved permit area covers 57,198.3 acres and acreage to affect is 53,586.0 acres. AR 23606. This decision found the reclamation plan in the PAP could accomplish reclamation as required by Wyo. Stat. § 35-11-406 *et seq.*, and considered necessary requirements for reclamation; the timing of expected reclamation activities and bonding obligations were addressed in the (SDD) decision document. AR 23606-23643.

The WDEQ decision stated that the permit is issued on the condition that the mining plan be approved by Interior and was forwarded to OSMRE. AR 23607.

The third phase of the permitting process is that which begins when the SDD is submitted to OSMRE for review and ultimately, approval, non-approval or conditional approval of the mining plan. Until the mine plan is approved by the Secretary, no mining operations can commence on the coal leases.

Additional formal public comment is not required at this stage. Petitioners have relied on 30 C.F.R. § 746.13 to support the argument that a violation has occurred because OSMRE did not provide for public comment and participation in this third phase. However, this regulation provides:

§ 746.13 Decision document and recommendation on mining plan.

OSM shall prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan to the Secretary. The recommendation shall be based, at a minimum, upon:

(a) The permit application package, including the resource recovery and protection plan;

(b) Information prepared in compliance with the National Environmental Policy Act of 1969, 42 U.S.C. 4321, et seq.;

(c) Documentation assuring compliance with the applicable requirements of other Federal laws, regulations and executive orders other than the Act;

(d) Comments and recommendations or concurrence of other Federal agencies, as applicable, and the public;

(e) The findings and recommendations of the Bureau of Land Management with respect to the resource recovery and protection plan and other requirements of the lease and the Mineral Leasing Act;

(f) The findings and recommendations of the regulatory authority with respect to the permit application and the State program; and

(g) The findings and recommendations of OSM with respect to the additional requirements of this subchapter.

The language of this regulation simply requires that the recommendation by OSMRE to the Secretary must be based upon the PAP, the R2P2, NEPA information, various documentation, and "comments and recommendations or concurrence of other Federal

38

agencies, as applicable, and the public." The regulation requires no more than consideration of existing public comment and recommendations. It does not dictate that any additional period for more public participation and comment be provided prior to or during the OSMRE review and recommendation for approval of the decision document by the Secretary. Petitioners' arguments are not supported by the applicable regulations and statutes.

## 2) Did the decision to approve the mining plan modification satisfy the reclamation requirements of SMCRA?

As outlined above, WDEQ approved the permit application December 3, 2013 and forwarded its decision document to OSMRE the next day for review and approval of the mining plan. The WDEQ decision document, SDD, determined that the reclamation plan satisfied the requirements for reclamation, as required by the Wyoming SMCRA program, Wyo. Stat. § 35-11-406(n) and LQD Coal Rules and Regulations. The SDD noted that the PAP, including 14 volumes of permit revision material, had been submitted by the operator to support the NARM amendment request, with the reclamation plan included in Volumes 28 and 29 of the PAP. AR 23608-23635. The document included a detailed schedule for the mining and reclamation progression. AR 23526-23628. Reference to the mining plan for NARM was noted, and this is where contemporaneous reclamation considerations were addressed. See e.g., AR, 15125-15126, mining plan, 1.3.2. The mining plan discussed possible delays or deferrals of backfill and grading and other operations necessary to

satisfy reclamation requirements. Hydrologic resources and bonding requirements were also specifically addressed.

The SDD was submitted to OSMRE for review and for the purpose of making a recommendation to the Secretary regarding the proposed mining plan modification – approve, disapprove, or conditionally approve the plan – pursuant to 30 C.F.R. Part 746. Following review, the OSMRE recommendation for approval without special conditions was made to the Secretary. AR 23464-23470. Approval of the SMCRA permit by WDEQ did not impose a requirement that OSMRE reassess that permit approval or mining plan from the ground up. OSMRE's task is to ensure that coal will be mined in compliance with other applicable federal statutes, AR 23423-23425, including but not limited to NEPA, AR 23469, 23474-23547, the Endangered Species Act, AR 23468-23550-23557, the National Historic Preservation Act, AR 23468-234679, 23560, and the MLA, AR 23468, 23548. The OSMRE decision recommendation was also based on the complete PAP, WDEQ's permit amendment decision, AR 23464-23470, and the USFS concurrence on the reclamation plan's impacts on post-mining land use. AR 23558.

The OSMRE review and decision process does not require a complete renewed review and assessment of the Wyoming review process, which has been delegated to the state pursuant to the cooperative agreement. OSMRE relies on the state and prior federal proceedings in making the decision to approve, approve with conditions, or disapprove the mining plan. The charge to OSMRE regarding its review of and recommendations regarding mining plans is outlined in 30 C.F.R. § 746.13:

§ 746.13 Decision document and recommendation on mining plan.

OSM shall prepare and submit to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan to the Secretary. The recommendation shall be based, at a minimum, upon:

> (a) The permit application package, including the resource recovery and protection plan;
>
> (b) Information prepared in compliance with the National Environmental Policy Act of 1969, 42 U.S.C. 4321, et seq.;
>
> (c) Documentation assuring compliance with the applicable requirements of other Federal laws, regulations and executive orders other than the Act;
>
> (d) Comments and recommendations or concurrence of other Federal agencies, as applicable, and the public;
>
> (e) The findings and recommendations of the Bureau of Land Management with respect to the resource recovery and protection plan and other requirements of the lease and the Mineral Leasing Act;
>
> (f) The findings and recommendations of the regulatory authority with respect to the permit application and the State program; and
>
> (g) The findings and recommendations of OSM with respect to the additional requirements of this subchapter.

See also, 48 Fed. Reg. 6012-01, 1983 WL 127785 (Feb. 16, 1983) ("OSM will receive copies of permit application packages, which include permit applications, not to review the applications for compliance with SMCRA, but to facilitate OSM's role in compliance with applicable laws not otherwise covered in the SMCRA review. The State will have the sole responsibility for reviewing permit applications for SMCRA compliance. In addition, both the proposed and final rules provide that the Secretary's decision on mining plan approval

will be based on, among other things, the State's findings on the permit application. See revised 30 CFR 746.13(f).")  The Court finds that the review activities undertaken by OSMRE in reaching the decision to recommend approval of the mining plan modification were appropriate and did not violate any requirements of SMCRA.

Petitioners have contended that approval of the mining plan modification fails to ensure "contemporaneous reclamation" and failed to ensure that the hydrologic plan reflects steps that will be taken to minimize hydrologic disturbances. In substance, this is a claim that the mining plan modification fails to satisfy performance standards for surface coal mining and reclamation operations on federal lands. They argue that the exclusive measure for determining the timeliness of reclamation is Phase III bond release, which was not employed in the reclamation plan. The general tenor of Petitioners' arguments is that OSMRE failed to assess reclamation adequately when the approval recommendation was made, and ultimately, approved by the Secretary.

The Court is not persuaded by Petitioners' arguments.  The applicable law does not suggest that the language requiring "contemporaneous reclamation" is as cramped as Petitioners suggest.  Petitioners have claimed that the detailed estimated timetable for major steps in the reclamation plan are absent from the mining plan and this failure precluded approval of the mining plan modification permit. However, Petitioners' assertions regarding the contours and time frames for reclamation are clearly contradicted in the record. The PAP provided extensive analysis and discussion, included maps and schedules for numerous listed reclamation activities such as grading, topsoil replacement

and fill, and accomplishing post-mining contours, and many other events. WDEQ reviewed the PAP, submitted the SDD to OSMRE for review and for OSMRE to make its recommendation whether the mining plan should be approved to the Secretary. While Petitioners ask for more, the regulatory scheme does not require more and the activities of the agencies involved in the review, recommendation and approval process satisfy the requirements of SMCRA.

Performance standards for environmental protection are set forth in 30 U.S.C. § 1265. This statute provides that any permit issued under an approved state program to conduct surface coal mining operations shall require that such surface coal mining operations will meet all applicable performance standards. The State of Wyoming in administration of the cooperative program must require operations to meet applicable performance standards.[2] Ensuring compliance with performance standards is a task delegated to WDEQ and the State of Wyoming; this task is not charged to OSMRE or the Secretary. The federal entities, OSMRE and the Secretary, provide limited oversight because the Secretary has an obligation to evaluate administration of approved state programs, inspect and monitor the operations of state programs. 30 U.S.C. §§ 1267, 1271.

More importantly, WDEQ did require with its approval of the permit for the mining plan modification that performance standards be met and satisfied. The PAP for the NARM mining plan demonstrated that the operator intends to meet performance standards and

---

[2] Performance standards for operations and reclamation are identified in 30 C.F.R. § 740.19.

achieve reclamation as "contemporaneously as practical following coal removal and continue concurrently with mining activity." AR 15125. The performance standards must insure that "all reclamation efforts proceed in an environmentally sound manner and as contemporaneously as practical with the surface coal mining operations[.]" 30 U.S.C. 1265(b)(16). Reclamation was considered by WDEQ when it determined that the permit for the mining plan modification should be approved and subsequently submitted to OSMRE; WDEQ recognized that "contemporaneous reclamation" may be subject to the vagaries of mining operations and may not be not performed with the immediacy or urgency that Petitioners believe is warranted for the NARM mining operations. All documents in the administrative record indicate that reclamation was considered, including the types of reclamation anticipated, estimated timetables for major steps in reclamation, and identification of reclamation activity blocks for reclamation in five year increments. AR 23626. Whether the contemplated reclamation, as set forth in the approved PAP, is actually successful is beyond the purview of this APA review and that is a matter for another day and time. Any invitation to speculate in that regard must be declined.

The Court disagrees that Phase III bond release is the exclusive means for measuring timeliness of reclamation and deciding whether the legal requirements for approval of the mining plan modification have been satisfied. Reclamation success is addressed in the OSMRE Directive REG-8, which provides guidelines for evaluating reclamation success. "Existing bond release systems and forms should be used to the extent possible to evaluate reclamation success." AR 23317. Bond release may be a

measure, but is not the only means for measuring reclamation success. AR 23320, 23276-23277, 23060, 23112, 23137-233157, 23173-23176, 23208-23229, 23248-23250, 23277-23287. OSMRE evaluates and reports on the effectiveness of successful reclamation on lands affected by surface coal mining regulations and recognizes that final bond release can be an inaccurate measure of actual reclamation activities. See e.g., AR 23275, 23280, 23098-23136 ( Evaluation Year 2011), 23137-23157 (Evaluation Year 2011), 23158-23027 (Evaluation Year 2012). The administrative record discloses repeatedly that WDEQ and OSMRE did consider contemporaneous reclamation carefully and considered various means for gauging successful reclamation and deciding whether the legal requirements were met and sufficient to support a decision to approve the mining plan modification.

Similarly, the operator's mining plan with respect to hydrology demonstrates commitment to a plan intended to "minimize disturbances to the prevailing hydrologic balance at the mine-site and in associated offsite areas and to the quality and quantity of water in surface and ground water systems both during and after surface coal mining operations and during reclamation[.]" 30 U.S.C. § 1265(b)(10). By way of example, a detailed hydrologic control plan was included in the mining plan, along with maps and specifications for restoration. AR 17440, 18095-18101. The record includes a hydrologic analysis, "Cumulative Hydrologic Impact Assessment of Coal Mining in the Southern Powder River Basin, Wyoming" which was considered by WDEQ. AR 18173-18478. With this record, it seem disingenuous for Petitioners to assert the record fails to include a discussion of the steps that must be taken to minimize disturbance to the hydrologic

balance.

WDEQ's expertise in this area was utilized to evaluate and determine that the reclamation plan in the mining plan satisfied SMCRA. This expertise was encompassed in the SDD that eventually was forwarded to OSMRE for its review and recommendation for approval of the mining plan. OSMRE's recommendation for approval of the mining plan was then forwarded to the Secretary. This was followed by the Secretary's decision to approve the mining plan. See e.g., AR 23562-23605. The record does not demonstrate that the decision of the Secretary to approve the mining plan modification as recommended by OSMRE following OSMRE's independent review and consideration of the SDD prepared by WDEQ was arbitrary, capricious, an abuse of discretion or otherwise not in accordance to law. None of the deficiencies Petitioners complain about are sufficient to demonstrate that reclamation was not considered by WDEQ, OSMRE, or the Secretary in making the decision ultimately approving the mining plan modification for NARM. Given the narrow scope of APA review, the Court is satisfied that the agency's decision was based upon relevant factors and was not a clear error of judgment.

The Court will briefly address the final issue raised by Petitioners concerning their claim that the Secretary failed to ensure that bonding was sufficient to protect natural resources. They have argued that Peabody's financial condition was "dire" at the time of the agency's decisions and that the assessment of Peabody's ability to self-bond should have been considered more carefully and thoroughly in making the decision to approve the mining plan modification. Petitioners have urged that the operator's "lack of

contemporaneous and timely reclamation" over the last 30 years demonstrates that the operator's "corporate guarantee" is inadequate. They submit that Peabody does not have the financial ability to meaningfully self-bond and ultimately, that Peabody will be financially unable to timely and successfully satisfy its reclamation obligations. The arguments raised about the decision approving self-bonding for reclamation purposes do not withstand scrutiny.

The administrative record reflects that the PAP addressed bonding in the reclamation plan, stating that "[t[he bond estimate for the current disturbance is shown in the current annual reports for the North Antelope Rochelle Mine. Any revised bond amounts and calculations were to be included in future annual reports." AR 17105. Bonding was addressed at length in NARM Annual Report for 2012 (Revised April 2013), Appendix B, Reclamation Performance Bond. This document includes information summarizing the Reclamation Bond for NARM and calculations for estimated reclamation costs. AR 19934-19974. The PAP was reviewed by WDEQ as required to do when a request to mine comes before it. Upon consideration and review of the PAP, WDEQ determined that an adequate bond for reclamation in the amount of approximately $333 million, payable to the State of Wyoming and the United States was appropriate. This determination, included in the SDD, was reviewed and relied upon by OSMRE prior to recommending, and receiving, approval from the Secretary for the mining plan modification that extends permitted mining in the NARM. AR 234690-23470.

An operator must make an initial application to self-bond at the time an application

is made for a license to mine. An applicant must provide a history of financial solvency demonstrating that financial condition satisfies the WDEQ standards for self-bonding. Pertinent statutory and regulatory provisions governing bonding are included at 30 U.S.C. § 1259; 30 C.F.R. §§ 950.10 and 950.15 (approving state regulatory program and amendments for the conduct of surface mining operations in Wyoming); Wyo. Stat. §§ 35-11-417 to -423; Wyoming Rules and Regulations, Department of Environmental Quality, Land Quality–Coal, Chapter 11(Self-Bonding Program) and Chapter 15 (Release of Bonds or Deposits and Termination of Jurisdiction for Surface Coal Mining Operations). Information relevant to bonding is in the PAP and was considered by WDEQ. It is also notable that the assessment of appropriate performance bonds is not a static process. Performance bond amounts are calculated annually, so the amount of a bond for reclamation and whether self-bonding is appropriate are reassessed frequently. The record discloses that WDEQ did consider the reclamation plan's provisions for bonding and that estimates for reclamation of disturbances may be revised annually. This information was passed to OSMRE, and in turn passed to the Secretary with the recommendation for approval from OSMRE; the Secretary approved the mining plan amendment.

As noted earlier, Petitioners have argued that subsequent financial events after Peabody's self-bond was approved by the Secretary show that the permit and mining plan modification approval, with the companion provisions regarding reclamation bonds, were not adequate. However, the Court has not allowed the Petitioners to supplement the record in this case to include matters that were never available at the time the decisions

to approve the mining permit and mining plan modification were made. In this APA action, the Court is limited to a review of the record and matters that were presented to the agencies when the decisions to approve the mining plan modification were made. Petitioners' arguments in this regard are beyond the scope of appropriate administrative review in this case and are unavailing. The record discloses that the agency's decision regarding reclamation was based on relevant factors. Even if the Court agreed that the bond determinations for reclamation by the operator in NARM were inadequate, the Court cannot substitute its judgment for that of the agency and will not do so now.

## Conclusion

In an APA action, the Court's review is based on the administrative record before the agency at the time of its decision. The Court's role is to determine whether the record supports the agency's decision as a matter of law and the scope of review is narrow. See *Colo. Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, (1983)). A decision is arbitrary and capricious if the agency (1) 'entirely failed to consider an important aspect of the problem,' (2) 'offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or product of agency expertise,' (3) 'failed to base its decision on consideration of the relevant factors,' or (4) made a 'clear error of judgment.'" *New Mexico ex rel Richardson v. Bureau of Land Management*, 565 F.3d 683, 704 (10th

Cir. 2009) (citation omitted).

For all of the reasons stated above, the Court finds and concludes that Petitioners have not established that the decision to approve the mining permit and mining plan modification was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The agency's decisions should be affirmed and the petition for review will be dismissed. Accordingly, it is therefore

**ORDERED** that the Petition for Review of Federal Agency Action (Doc. 1) shall be, and is, **DISMISSED. It is further**

**ORDERED** that the agency action approving a mining plan modification for Peabody Powder River Mining, LLC's North Antelope Rochelle Mine in the Powder River Basin shall be, and is, **AFFIRMED.**

Dated this _6th_ day of December 2018.

ALAN B. JOHNSON
UNITED STATES DISTRICT JUDGE